*Glenn Joseph Raynor v. State of Maryland,* No. 69, September Term 2012

**CRIMINAL PROCEDURE — SEARCH AND SEIZURE — REASONABLE EXPECTATION OF PRIVACY — DNA TESTING** — The test for ascertaining whether a particular form of conduct is a search for purposes of the Fourth Amendment consists of two parts, each of which must be satisfied in order for the Fourth Amendment to apply: (1) a defendant must demonstrate an actual, subjective expectation of privacy in the item or place searched and (2) prove that the expectation is one that society is prepared to recognize as objectively reasonable. The DNA testing of the 13 identifying "junk" loci within one's genetic material, not obtained by means of a physical intrusion into the person's body, does not constitute a Fourth Amendment search.

Circuit Court for Harford County
Case No. 12-K-08-001527
Argued: April 8, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 69

September Term, 2012

_____

GLENN JOSEPH RAYNOR

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
McAuliffe, John F. (Retired, Specially
Assigned),

            JJ.

_____

Opinion by Barbera, C.J.
Harrell, Greene, and Adkins, J.J., dissent

_____

Filed: August 27, 2014

This appeal has its genesis in the commission of a rape in 2006. More than two years later, the victim of the rape contacted the police and explained that she suspected that Petitioner, Glenn Joseph Raynor, had been the perpetrator. Shortly thereafter, Petitioner agreed to the request of the police to come to the police station for an interview. At some point during the interview, the police requested Petitioner's consent to the taking of a DNA sample for comparison to DNA evidence collected at the scene of the rape. He declined. Minutes after the interview concluded and Petitioner had departed the station, the police, who had noticed Petitioner rubbing his bare arms against the armrests of the chair in which he had been seated, took swabs of the armrests in an attempt to collect his DNA. The police submitted those swabs to the crime lab for DNA analysis, which revealed that the DNA extracted from the swabs matched DNA samples investigators had collected from the scene of the rape.

Further investigation ensued and, eventually, Petitioner was charged with first-degree rape and related offenses. He filed a pre-trial motion seeking suppression of the DNA evidence and all evidence derived therefrom, arguing that the warrantless collection and testing of cellular material that he shed during his interview at the police station violated his right under the Fourth Amendment to be free from unreasonable searches and seizures. The suppression court denied the motion, having concluded that Petitioner had no reasonable expectation of privacy in the DNA evidence left on the chair. The Court of Special Appeals agreed with that ruling.

Petitioner no longer disputes, as he did before the suppression court, that the police

lawfully obtained his DNA from the armrests of the chair in the station, and we assume, solely for purposes of our present analysis, that the police were not required to have a warrant or individualized suspicion of Petitioner's commission of the rape before collecting those DNA samples. Accordingly, the only legal question before us is whether analysis by the police of the 13 identifying "junk" loci contained within Petitioner's DNA was a search for purposes of the Fourth Amendment. For reasons we shall explain, we hold that the DNA testing at issue in the present case was not a search under the Fourth Amendment.

I.

The rape occurred in Bel Air, Harford County, Maryland during the early morning hours of April 2, 2006. The facts material to its commission and the police investigation that followed are undisputed. At approximately 5:00 a.m., the perpetrator broke into the home of the victim[1] through a patio door that led to the basement. Shortly thereafter, the perpetrator entered the victim's bedroom, raped her repeatedly, and fled the scene. The victim did not see her attacker's face because, upon entering the bedroom, he pressed a pillow against her face and blindfolded her with his t-shirt. The victim noticed, however, that her attacker was Caucasian, had a medium build, and emanated a "metallic scent."

After the perpetrator fled, the victim ran to her neighbor's home, where she reported the rape to the police. Investigators responded to the victim's home and a crime scene technician processed it for evidence. The technician collected material possibly containing

---

[1] We do not use the victim's name or initials in an effort to protect her privacy.

DNA, including blood from a pillow found in the victim's bedroom and the area near the door through which the perpetrator had entered. Meanwhile, a police officer accompanied the victim to the hospital where she underwent a rape examination, during which a nurse took vaginal and anal swabs.

The victim contacted the police on numerous occasions throughout the next two years to inform them about potential suspects. During that time, the police obtained consensual DNA samples from approximately 20 individuals with possible connections to the 2006 rape, including several of the victim's neighbors. None of those DNA samples matched the DNA collected from the victim's home on the day of the rape.

In July 2008, the victim contacted the lead investigator assigned to the case, Trooper First Class Dana Wenger, to report her suspicion that Petitioner was the rapist. The victim explained that she and Petitioner had gone to school together, he was the previous owner of the home in which the rape occurred, and his body type matched that of the man who raped her. Approximately two weeks later, Trooper Wenger left a note at Petitioner's home asking him to contact her. A few days later, Petitioner called the trooper and agreed to come to the station later that day to answer questions related to the rape investigation.

Upon Petitioner's arrival at the station, Trooper Wenger escorted him to a vacant office and directed him to have a seat. Shortly thereafter, Sergeant James DeCourcey entered the room and a 30-minute interview ensued. The officers noted during the interview that Petitioner, who was wearing a short-sleeved shirt, repeatedly rubbed his bare arms against

the armrests of his chair, and his body carried a metallic odor similar to the odor the victim had described smelling during the rape.

At some point during the interview, Trooper Wenger asked Petitioner for his consent to the taking of a DNA swab of his mouth. Petitioner responded that he would consent only if the police agreed to destroy the DNA sample after they concluded their investigation of the rape. When the police declined to give that assurance, Petitioner refused to provide a DNA sample, and the interview concluded.

Minutes after Trooper Wenger escorted Petitioner out of the station, Sergeant DeCourcey took swabs of the armrests of the chair in which Petitioner had sat during the interview, sealed those swabs in an envelope, and placed them in an evidence locker. Two days later, Trooper Wenger submitted the swabs to the Maryland State Police Forensic Sciences Division laboratory for DNA analysis. The analysis revealed that the DNA extracted from the swabs of the armrests matched the DNA extracted from blood collected at the scene of the rape.

Trooper Wenger relied upon the results of the lab's DNA analysis, as well as other evidence the police had gathered during their investigation, in applying for and obtaining warrants to arrest Petitioner, collect an additional DNA sample, and search his home. After arresting Petitioner, the police transported him to the station, interviewed him, and, at some point, took a DNA sample via a buccal swab. That DNA sample, like the DNA samples collected from the chair in the police station, matched DNA collected from the victim's home

-4-

on the day of the rape. A second DNA analysis of the buccal swab revealed a match to DNA extracted from the vaginal and anal swabs obtained during the victim's rape examination.

The State charged Petitioner with several counts of rape, assault, burglary, and related crimes. He was tried before a jury, which heard the results of the DNA analyses and other evidence linking him to the crimes. The jury found Petitioner guilty of two counts of rape and related crimes, for which the court sentenced him to a total of 100 years' imprisonment.

*The Suppression Hearing*

Petitioner filed a pre-trial motion to suppress the DNA evidence the police obtained from the chair in the police station, and the fruits derived therefrom.[2] He argued that the police violated his right under the Fourth Amendment to be free from unreasonable searches and seizures, by seizing his genetic material[3] from the armrests of the chair and then searching that material for the 13 loci on the DNA strand that allowed the police to connect him to the rape. He claimed in the alternative that, even if the police officer's obtaining his genetic material by swabbing the chair was not an unlawful seizure for purposes of the Fourth Amendment, the police nonetheless conducted a separate search that violated the

---

[2] Petitioner asserted that the warrants to arrest him, collect an additional DNA sample, and search his home were predicated upon the DNA evidence obtained from the armrests of the chair in the police station. He thus sought suppression of any statements he made to police after his arrest, the DNA sample police took after his arrest, and any evidence recovered from his home pursuant to the search warrant.

[3] Petitioner uses this phrase to describe the perspiration and/or skin cells he shed onto the armrests of the chair during his interview in the police station. For the purposes of our discussion, we shall adopt, in certain places, the term "genetic material."

Fourth Amendment when they performed a DNA analysis of the material.[4]

The suppression court denied the motion, reasoning in pertinent part:

> [D]oes [the] Fourth Amendment apply at all in this case? . . . This is a very simple matter as I see it. Does he have a reasonable expectation of privacy that society is prepared to recognize of what's left [on] a chair when he gets up and leaves? The answer to that as far as I am concerned is no, he has no such expectation of privacy. He is in a public building. . . . Yes, he refused [to submit voluntarily a DNA sample], there is no doubt about that. He refused to give consent. So when he refuses to give consent, does that mean that if the police can get [a DNA sample] some other way, they can't use it? Of course not.
>
> ***
>
> So I think that the seizure of the sample did not violate the Fourth Amendment at all because I don't think the Fourth Amendment applies in this situation because I don't think he had any reasonable expectation of privacy with regard to the [genetic material] he left on the chair.
>
> ***
>
> I don't think DNA is any different in terms of leaving it anywhere than a fingerprint [or] than if he walks out of the [police station] and somebody takes his photograph. He is sitting in there and [the police] ask can we take a picture of you . . . to have other people look at it. He says no . . . . So [he] walks outside the [station], is standing on the sidewalk, and they take his picture. He is in a public place. When he goes in there, does he have any expectation that anything he leaves that he is going to continue to have a privacy right in it? I don't think so. And because I don't think so, because I don't think the Fourth Amendment applies at all, because I don't think he had any reasonable expectation [of privacy] . . . that society is prepared to recognize as reasonable, then the same logic applies because the use of [the DNA evidence] to obtain the search warrants also is perfectly legitimate.
>
> ***

---

[4]  In support of that argument, Petitioner relied upon the so-called "container cases." *E.g.*, *United States v. Chadwick*, 433 U.S. 1 (1977). He reasoned that the genetic material he deposited on the chair was a closed "container" with no independent value to the police and that, to "open" the container to reveal its contents, namely Petitioner's DNA, the police were required to obtain a warrant. The suppression court rejected that theory and, as we shall see, Petitioner does not rely upon that argument on appeal.

So the Motion to Suppress is going to be denied . . . .

*The Appeal*

On appeal to the Court of Special Appeals, Petitioner contended that, in the absence of a proper warrant, the police were prohibited from "analyzing the swab they took from the chair, developing a DNA profile, and comparing it to the DNA recovered from the crime scene." *Raynor v. State*, 201 Md. App. 209, 217 (2011). The Court of Special Appeals held that the Fourth Amendment did not apply to the testing of the genetic material Petitioner left on the chair, reasoning that Petitioner's DNA profile was used for identification purposes only and he had "no objectively reasonable expectation of privacy in the identifying characteristics that could be gleaned from the normal biological residue he left behind." *Id.* at 225. The court relied upon certain similarities between DNA evidence and fingerprints: "[L]ike the analysis of a latent fingerprint, which involves no physical intrusion into the body and is used for identification purposes only, the analysis in the instant case of DNA evidence . . . was not a constitutionally protected search." *Id.* at 222.

We granted Petitioner's petition for a writ of certiorari to consider the following questions posed by Petitioner:[5]

---

[5] In November 2012, after having granted certiorari, we stayed the present appeal pending resolution by the Supreme Court of the United States of *Maryland v. King*, 133 S. Ct. 1958 (2013). We lifted the stay in August 2013, shortly after the Supreme Court issued its opinion in *King*.

1.  Whether, under the Fourth Amendment . . . ,[6] a free citizen maintains an objectively reasonable expectation of privacy in the DNA found in genetic material involuntarily and unknowingly deposited through ordinary biological processes?

2.  Whether, under the Fourth Amendment . . . , the determination of an individual's expectation of privacy requires consideration of the privacy interest in the information obtained, and not just the privacy interest in the place in which it was found?

We also granted the State's conditional cross-petition, which asks, assuming the Fourth Amendment applies, whether the testing of Petitioner's genetic material constituted a limited intrusion justified by reasonable suspicion that he had committed the rape and, if not, whether the police conduct in this case compels application of the Fourth Amendment exclusionary rule. Given our disposition of the case on the basis of the threshold questions presented by Petitioner, we need not, and therefore do not, reach the questions the State presents in its conditional cross-petition.

II.

In reviewing the denial of a motion to suppress evidence, as we do here, "we must rely solely upon the record developed at the suppression hearing." *See Briscoe v. State*, 422 Md. 384, 396 (2011). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion," *id.*, here, the State. We accept

---

[6] Petitioner argued in his petition for writ of certiorari that Article 26 of the Maryland Declaration of Rights provides an independent basis for reversal of the judgment of the Court of Special Appeals. Yet, in his briefs to this Court, Petitioner explains that he does "not endeavor[] to address Article 26 as an independent basis for reversal."

the suppression court's factual findings unless they are shown to be clearly erroneous. *Id.* We, however, make our own independent constitutional appraisal of the suppression court's ruling, by applying the law to the facts found by that court. *Id.*

None of the evidence pertinent to the legal issue raised in the present appeal is disputed and the suppression court's ruling reflects its having credited the testimony of Trooper Wenger and Sergeant DeCourcey. We therefore accept the officers' testimony related to the collection and testing of Petitioner's genetic material as we analyze the parties' legal arguments.

### III.

We begin our discussion by clarifying what legal issue is *not* before us. In his briefs to this Court, Petitioner argues, as he did before the suppression court, that the Fourth Amendment required the police to obtain warrants authorizing both the collection of the genetic material from the armrests of the chair and the DNA testing of that material. During oral argument before us, however, Petitioner, through counsel, stated "for the sake of this discussion, we would concede that, fine, . . . it was okay for [the police] to take the stuff off of their chair." Counsel further conceded that "it really does not matter that much whether it gets analyzed as a one-step process or a two-step process" because "[t]he obvious real issue in this case is the content of what [the police] got when they used their technology to analyze [Petitioner's DNA]." Given Petitioner's concession that the police lawfully obtained his genetic material from the armrests of the chair, the precise question for decision is whether

law enforcement's testing of the identifying loci within that DNA material for the purpose of determining whether those loci match that of DNA left at a crime scene constitutes a search under the Fourth Amendment.

The Fourth Amendment to the Constitution of the United States provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Recently, in *Maryland v. King*, 133 S. Ct. 1958 (2013), the Supreme Court held "that using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" for purposes of the Fourth Amendment, reasoning that "[v]irtually any intrusio[n] into the human body . . . will work an invasion of cherished personal security that is subject to constitutional scrutiny." *Id.* at 1968-69 (quotations and citations omitted). The Court did not decide explicitly whether the testing of the 13 identifying loci the police later extracted from King's DNA sample required a separate Fourth Amendment analysis, and how, if at all, the analysis would have differed had the police obtained King's DNA absent a physical intrusion into his body.

The case at bar implicates those questions left unanswered in *King*. For reasons we shall explain, we hold that law enforcement's analysis of the 13 identifying loci within Petitioner's DNA left behind on the chair at the police station, in order to determine a match with the DNA the police collected from the scene of the rape, was not a search, as that term is employed in Fourth Amendment parlance.

IV.

It is bedrock constitutional law "that the rights accorded by the Fourth Amendment 'are implicated only if the conduct of the [government] officials at issue . . . infringed an expectation of privacy that society is prepared to consider reasonable.'" *Walker v. State*, 432 Md. 587, 605 (2013) (quoting *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion)). The test for ascertaining whether a particular form of conduct is a search for purposes of the Fourth Amendment is often referred to as the *Katz* test, so named for *Katz v. United States*, 389 U.S. 347 (1967), the case in which Justice Harlan's much-quoted concurrence described the test. *See id.* at 361 (Harlan, J., concurring). Justice Harlan's formulation remains the lodestar for determining whether police conduct is a search for purposes of the Fourth Amendment. *See, e.g., Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.").[7]

The *Katz* test consists of two parts, "each of which must be satisfied in order for the Fourth Amendment to apply: (1) a defendant must 'demonstrate an actual, subjective

_____

[7] We do not overlook *United States v. Jones*, 132 S. Ct. 945 (2012), in which the Supreme Court resorted to a property-based approach to determine whether a Fourth Amendment search had occurred. The Court's reliance upon principles of trespass law in *Jones* has not displaced the "reasonable expectation of privacy" test set forth in *Katz*. Indeed, the *Jones* Court made clear that "we do not make trespass the exclusive test" and "where a classic trespassory search is not involved . . . resort must be had to *Katz* analysis." 132 S. Ct. at 953-54; *see also Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) (stating that "[t]he *Katz* reasonable-expectations test 'has been *added to* . . .' the traditional property-based understanding of the Fourth Amendment") (quoting *Jones*, 132 S. Ct. at 952).

-11-

expectation of privacy in the item or place searched' and (2) 'prove that the expectation is one that society is prepared to recognize as reasonable.'" *Walker*, 432 Md. at 605 (quoting *Corbin v. State*, 428 Md. 488, 499 (2012)); *see also Williamson v. State*, 413 Md. 521, 534 (2010). "A person demonstrates a subjective expectation of privacy by showing that he or she sought 'to preserve something as private.'" *Williamson*, 413 Md. at 535 (quoting *McFarlin v. State*, 409 Md. 391, 404 (2009)). An objectively reasonable expectation of privacy, by contrast, has "'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society,' and constitutes 'more than a subjective expectation of not being discovered.'" *Id.* (quoting *Rakas v. Illinois*, 439 U.S. 128, 143-44 n.12 (1978)). "We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *Ortega*, 480 U.S. at 715. Nonetheless, common experience and social norms bear upon our assessment of whether one has an objectively reasonable expectation of privacy in a particular item or place. *See California v. Greenwood*, 486 U.S. 35, 51 n.3 (1988) ("Expectations of privacy are established by general social norms.") (citation omitted); 1 Wayne R. LaFave, Search and Seizure § 2.1(d), at 587 (5th ed. 2012) ("[I]t is necessary to look to the customs and values of the past and present. . . . [,] the structure of society, the patterns of interaction, [and] the web of norms and values.") (quotations and citations omitted).

Petitioner relies upon the *Katz* test to argue that the analysis of the identifying loci

within his DNA implicated the protections of the Fourth Amendment. He first claims that he demonstrated a subjective expectation of privacy in his DNA when, during the course of his interview with Trooper Wenger and Sergeant DeCourcey, he declined to consent to the taking of a DNA sample, thereby asserting a belief that "his genetic markers would not be inspected." The State accepts as much, and so do we.

Petitioner further claims, as he must for his argument to prevail, that his expectation of privacy in his DNA, under these circumstances, was objectively reasonable. In making that argument, he urges us to "focus . . . squarely on the 'treasure map' . . . of information capable of being culled from" one's DNA. He claims that, contrary to the conclusion of the Court of Special Appeals, individuals have a "much greater" expectation of privacy in their DNA than their fingerprints because DNA contains "a massive amount of deeply personal information," including "medical history, family history, disorders, behavioral characteristics, and . . . propensity to . . . commit certain behaviors in the future."

The State counters that Petitioner did not possess an objectively reasonable expectation of privacy in the information the police analyzed because they tested only 13 junk loci, which, unlike other regions of the DNA strand, do not disclose the intimate genetic information about which Petitioner expresses concern. Instead, those loci reveal only information related to a person's identity. In this regard, the State argues, law enforcement's testing of the DNA evidence in this case is indistinguishable from its testing of fingerprints left unknowingly upon surfaces in public places, which does not implicate the protections of

-13-

the Fourth Amendment.

We agree with the State. The Supreme Court has made clear that one's identifying physical characteristics are generally outside the protection of the Fourth Amendment. *See United States v. Dionisio*, 410 U.S. 1, 14 (1973); *see also State v. Athan*, 158 P.3d 27, 37 (Wash. 2007) (en banc) ("Physical characteristics [that] are exposed to the public are not subject to Fourth Amendment protection.") (citing *United States v. Mara*, 410 U.S. 19, 21 (1973)). The analysis of such physical characteristics by law enforcement "involves none of the probing into an individual's private life and thoughts that marks" a Fourth Amendment search. *See Dionisio*, 410 U.S. at 15 (citation omitted). Consequently, the character of the information specifically sought and obtained from the DNA testing of Petitioner's genetic material—whether it revealed only identifying physical characteristics—is paramount in assessing the objective reasonableness of his asserted privacy interest.

With the advent of DNA testing technology, law enforcement has a highly effective means of identifying an individual as "unique" in the general population and thereby identifying, or excluding, a criminal suspect as the actor in the commission of a crime. *King*, 133 S. Ct. at 1966 (noting the view among "law enforcement, the defense bar, and the courts" of "DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty'") (quoting *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009)). As described in *King*, "[t]he current standard for forensic DNA testing relies on an analysis of the chromosomes located within the nucleus of all human

-14-

cells. The DNA material in chromosomes is composed of 'coding' and 'non-coding' regions." *Id.* at 1966-67 (quotations and citation omitted). Coding regions—otherwise known as genes—"contain the information necessary for a cell to make proteins." *Id.* at 1967 (citation omitted). Non-coding regions, which do not relate directly to the production of proteins, are generally referred to as junk DNA; it is these regions of junk DNA that are "used with near certainty to identify a person." *Id.* Although highly useful for identification purposes, junk DNA "does not show more far-reaching and complex characteristics like genetic traits." *Id.*; *accord Williamson*, 413 Md. at 543 (noting that the 13 junk loci consist of stretches of DNA that "do not presently recognize traits" and "are not associated with any known physical or medical characteristics") (citation omitted); *State v. Belt*, 179 P.3d 443, 448 (Kan. 2008) ("In essence, the loci are merely addresses . . . .").[8]

Moreover, as noted by the Supreme Court in *King*, there exists no incentive for the police to unveil more intimate information contained in a suspect's DNA, even if the police

---

[8] The *King* Court explained the procedure for conducting forensic DNA analysis: "Many of the patterns found in DNA are shared among all people, so forensic analysis focuses on repeated DNA sequences scattered throughout the human genome, known as 'short tandem repeats' (STRs)." 133 S. Ct. at 1967 (quotations and citation omitted). The analysis involves the examination of "alleles." See *id.* (explaining that "[t]he alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as 'alleles' . . . and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual") (citation omitted). The *King* Court observed that "[f]uture refinements may improve present technology, but even now STR analysis makes it 'possible to determine whether a biological tissue matches a suspect with near certainty.'" *Id.* (quoting *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62 (2009)).

had access to the technology to do so:

> [E]ven if non-coding alleles could provide some [private medical] information, they are not in fact tested for that end. It is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which [other] samples may be matched. This parallels a similar safeguard based on actual practice in the school drug-testing context, where the Court deemed it significant that the tests at issue [in those cases] look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. If in the future police analyze [DNA] samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, *that case would present additional privacy concerns not present here*.

133 S. Ct. at 1979 (quotations and citation omitted) (emphasis added); *see also* Albert E. Scherr, *Genetic Privacy & The Fourth Amendment: Unregulated Surreptitious DNA Harvesting*, 47 Ga. L. Rev. 445, 474 (2013) (acknowledging that "no evidence currently exists" indicating that police analyze DNA samples "for information . . . beyond that provided by the more standard 13-loci . . . testing").

Petitioner does not cite, nor has our research revealed, a case holding that law enforcement's analysis of fingerprints left behind by a potential suspect implicates the protections of the Fourth Amendment. In fact, the Supreme Court has given, albeit impliedly, the constitutional "go ahead" for such police practices. *See Dionisio*, 410 U.S. at 14-15; *see also Doe v. Poritz*, 662 A.2d 367, 407 (N.J. 1995) (citing *Cupp v. Murphy*, 412 U.S. 291, 295 (1973), and *Dionisio*, 410 U.S. at 14, for the proposition that "no person can have a reasonable expectation of privacy in her fingerprints."). Petitioner, evidently recognizing the Supreme Court's tacit approval of fingerprint testing, argues not that the

police in the present case would have been prohibited from analyzing fingerprints he left behind at the station, but rather, that the DNA evidence in the present case is "physically and functionally different than fingerprints," and therefore subject to different treatment under the Fourth Amendment.

We disagree with Petitioner that targeted analysis of the identifying loci within genetic material differs in any meaningful way from analysis of a fingerprint. Indeed, it is generally accepted that analysis of a person's DNA, solely for purposes of identification, reveals no more information about that person than does analysis of his or her latent fingerprints. *King*, 133 S. Ct. at 1963-64 ("The only difference between DNA analysis and fingerprint databases is the unparalleled accuracy DNA provides."); *accord Williamson*, 413 Md. at 542 (noting that DNA tested for identification purposes is "akin to . . . a fingerprint") (citation omitted). In her concurring opinion in *State v. Raines*, 383 Md. 1 (2004), Judge Raker explained the functional similarities between DNA used for identification purposes and fingerprints:

> DNA type need be no more informative than an ordinary fingerprint. For example, the [13 junk] loci . . . are noncoding, nonregulatory loci that are not linked to any genes in a way that would permit one to discern any socially stigmatizing conditions. The "profile" of an individual's DNA molecule . . . is a series of numbers. The numbers have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual's personal traits or propensities. In this sense, the [13 loci are] very much like a social security number—though it is longer and is assigned by chance, not by the federal government. In itself, the series of numbers can tell nothing about a person. But because the sequence of numbers is so likely to be unique . . ., it can be linked to identifiers such as name, date of birth, or social security number, and used to determine the source of DNA found in the course of criminal investigations . . . .

-17-

383 Md. at 45 (Raker, J., concurring) (quoting D.H. Kaye & Michael E. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population-Wide Coverage*, 2003 Wis. L. Rev. 413, 431-32 (2003)).

A number of federal courts and the courts of some of our sister states also recognize the functional similarities between the non-coding regions of DNA and fingerprint evidence. *E.g., Haskell v. Harris*, 669 F.3d 1049, 1063 (9th Cir. 2012) (stating that "[t]he collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee's fingerprints to determine whether he is implicated in another crime"), *aff'd en banc*, 745 F.3d 1269 (9th Cir. 2014); *United States v. Mitchell*, 652 F.3d 387, 412 (3d Cir. 2011) (concluding that "DNA profiles . . . function as 'genetic fingerprints' used only for identification purposes"); *State v. Surge*, 156 P.3d 208, 212 (Wash. 2007) (en banc) (observing that the collection of DNA evidence in that case was "limited to the same purposes as fingerprints, photos, or other identifying information"); s*ee also* Edward J. Imwinkelried & D.H. Kaye, *DNA Typing: Emerging or Neglected Issues*, 76 Wash. L. Rev. 413, 440 (2001) ("[F]or the present the better course is to treat human cells left in public places like fingerprints in deciding what expectation of privacy is reasonable.").

Petitioner contends that DNA differs from fingerprints because it has the potential to provide more information about a person. Petitioner relies, in part, upon *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), and *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012). The Supreme Court held in *Skinner* that the toxicological testing of

railroad employees' blood and urine, in order to detect the presence of alcohol or drugs, "intrude[d] upon expectations of privacy that society has long recognized as reasonable" and thus constituted a Fourth Amendment search. 489 U.S. at 609-10, 616-17 (noting that the "chemical analysis of the sample to obtain physiological data is a[n] . . . invasion of the tested employee's privacy interests"). In *Davis*, the United States Court of Appeals for the Fourth Circuit, relying upon *Skinner*, held "that the extraction of Davis' DNA sample from his [lawfully seized] clothing and the creation of his DNA profile constituted a search for Fourth Amendment purposes." 690 F.3d at 246. The *Davis* Court cited *Skinner* for the following:

> [B]ecause the analysis of biological samples, such as those derived from blood, urine, or other bodily fluids, can reveal "physiological data" and a "host of private medical facts," such analyses may "intrude[] upon expectations of privacy that society has long recognized as reasonable." . . . Therefore, such analyses often qualify as a search under the Fourth Amendment. . . . Similarly, an analysis required to obtain a DNA profile, like the chemical analysis of blood and urine at issue in *Skinner*, generally qualifies as a search, because an individual retains a legitimate expectation of privacy in the information obtained from the testing.

*Id.* at 243-44 (citations omitted). The *Davis* Court added that, at the time police lawfully came into possession of Davis's clothing, he was not under arrest, but rather, a "free person" among the public at large, who enjoys "a greater privacy interest in [his or her] DNA than would persons who have been arrested." *Id.* at 244-45.

*Skinner* is of little assistance to Petitioner because here, unlike in *Skinner*, the targeted analysis of the 13 identifying loci did not reveal "physiological data" about Petitioner, but rather, revealed only identifying information. For much the same reason, *Davis* offers

Petitioner little succor. The *Davis* Court's conclusion that the DNA testing at issue in that case constituted a Fourth Amendment search rested on what may now be a faulty premise, given the discussion in *King* that DNA analysis limited to the 13 junk loci within a person's DNA discloses only such information as identifies with near certainty that person as unique.[9]

Petitioner does not allege that the police in the present case tested any portion of his DNA other than the 13 junk loci, nor does he claim that law enforcement, at present, has the technological capabilities to do so. In short, Petitioner attempts to "evoke images of an oppressive 'Big Brother' cataloguing our most intimate traits," but the reality here is "far less troubling." *Harris*, 669 F.3d at 1059; *accord Williamson*, 413 Md. at 543 (finding that Williamson's argument regarding potential misuse of DNA beyond the testing of the 13 junk loci, which was not alleged in the case, did not have "feet").

Petitioner further claims that DNA is distinguishable from fingerprint evidence because it is not visible to the unaided eye, whereas fingerprints left on a surface are more readily apparent. Even so, the fact remains that a fingerprint, like the genetic material swabbed here, has no independent value to the police until it is tested and compared to other, previously collected fingerprints.

Petitioner finally contends that DNA evidence is used for different purposes than are

---

[9] For the reasons we have discussed so far, the analysis of the junk loci contained within the DNA collected from the chair is not a Fourth Amendment search because no individual has a reasonable expectation of privacy in his or her identifying physical characteristics. It therefore matters not that, at the time of the analysis, Petitioner was, in the words of *Davis*, a "free person." *United States v. Davis*, 690 F.3d 226, 245 (4th Cir. 2012).

fingerprints, after it is collected. We disagree. It cannot be doubted that "both DNA and fingerprints can be used to link suspects to crime scenes." *Garcia-Torres v. State*, 949 N.E.2d 1229, 1235 (Ind. 2011); *accord Harris*, 669 F.3d at 1063 ("The . . . use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee's fingerprints to determine whether he is implicated in another crime."). In the present case, had the police dusted the chair in the police station for Petitioner's fingerprints, that evidence would have been used for the same purpose as his DNA: the police would have analyzed the fingerprints to reveal their identifying characteristics and compared them to any fingerprint evidence collected at the victim's home.[10] The only distinction that reasonably can be drawn is that the DNA test results in the present case directly linked Petitioner not merely to the crime scene but also directly and with certainty to the rape of the victim.

In determining that Petitioner does not possess a reasonable expectation of privacy in the identifying characteristics of his DNA, we continue down a path set forth by this Court in *Williamson v. State*, *supra*. In that case, Williamson, who was in police custody awaiting booking, discarded on the floor of his jail cell an empty cup out of which he had drunk. 413 Md. at 528. After Williamson was removed from the cell, the police retrieved the discarded

---

[10] During oral argument, Petitioner argued that the police used his DNA for "traditional crime detection" rather than "just identification." Other courts have observed, and we agree, that "'[i]dentification' encompasses not merely a person's name, but also other crimes to which the individual is linked." *Haskell v. Harris*, 669 F.3d 1049, 1062 (9th Cir. 2012).

cup, submitted it to the crime lab for DNA analysis, and eventually discovered that DNA extracted from the cup matched DNA collected at the scene of a crime committed approximately four years earlier. *Id.* We addressed several theories advanced by Williamson in connection with the officers' collection of the discarded cup and the DNA testing of the genetic material that Williamson had left on it. We concluded, first, that he had abandoned any expectation of privacy in the cup itself, *id.* at 536-38, and, ultimately, that the police did not violate the Fourth Amendment by testing the lawfully acquired DNA that Williamson had deposited on the discarded cup, *id.* at 547.[11]

We addressed Williamson's contention that he enjoyed a "heightened privacy interest in avoiding DNA testing, because of the amount of information that *could* be revealed." *Id.* at 541 (emphasis added). We rejected the contention, noting that "Williamson's DNA was tested for identification only" and concluding that the DNA-related information disclosed by examination of only the 13 junk loci was akin to the identifying information contained within fingerprints. *See id.* at 542-43.

Petitioner, in arguing that he possessed a reasonable expectation of privacy in his DNA, like Williamson, relies upon the amount of sensitive information police could have unveiled if they misused his DNA for purposes other than identification. *Id.* at 542-43. We

---

[11] The State does not argue in the present case that Petitioner abandoned any expectation of privacy he might otherwise have in the DNA contained in the material left on the chair, but rather, that Petitioner "never had a privacy interest [in his DNA] to abandon." We therefore do not consider whether Petitioner abandoned an expectation of privacy in the DNA that was tested.

acknowledged in *Williamson* that "there may be debate regarding privacy concerns should technological advances permit testing of DNA to glean more information from acquired DNA than mere identification." *Id.* at 543. Those concerns have not been raised in this case. The present case, like *Williamson*, generates only the question of whether Petitioner had an objectively reasonable privacy interest in the *identifying* characteristics of his DNA.

Some courts in our sister states have taken a similar tack, holding that "the use of DNA for identification purposes only does not infringe on a privacy interest in one's genetic identity because the DNA is not being used to reveal personal information." *See Piro v. State*, 190 P.3d 905, 911 (Idaho Ct. App. 2008) (collecting cases). Closest to the present case is an en banc decision of the Supreme Court of Washington, *State v. Athan*, *supra*.

In *Athan*, the police, who were investigating an unsolved murder, mailed to a suspect, Athan, a fictitious letter, purporting to be from a law firm, asking if he wanted to join a class action lawsuit. 158 P.3d at 31. When the police received Athan's response, they extracted his DNA from the saliva he had used to close the return envelope, analyzed that DNA, and discovered that it matched a DNA sample recovered from the victim in the unsolved case. *Id.* at 32. The *Athan* Court held that the "analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment." *Id.* at 37. The court reasoned that "[p]hysical characteristics which are exposed to the public," such as those contained within one's DNA, "are not subject to Fourth Amendment protection" because the "[e]xamination

-23-

of such physical characteristics involves none of the probing into an individual's private life and thoughts that marks a[] . . . search." *Id*. (quotations and citations omitted). The court further observed that the "[p]olice may surreptitiously follow a suspect to collect DNA, fingerprints, footprints, or other possibly incriminating evidence, without violating that suspect's" rights under the Fourth Amendment. *Id*.

We find persuasive the reasoning in *Athan*. Like Athan, Petitioner exposed to the public, albeit not to the naked eye, the identifying content of the genetic material he left on the armrests of the chair. Moreover, like Athan, Petitioner was not subjected to the forcible collection of his genetic material, or any other bodily intrusion. *See id.*

Petitioner argues that, even if the police analyzed only the identifying characteristics of his DNA, he had an objectively reasonable expectation of privacy in that evidence because, unlike fingerprints, blood, or saliva, society is generally unaware that individuals shed uncontrollably genetic material whenever they venture into public. Even assuming that Petitioner is correct in his premise,[12] the fact that one has not knowingly exposed to the

---

[12] At least one commentator has suggested that society is generally aware of the nature of DNA evidence:

> Society knows about DNA and its capabilities through television and other media. Furthermore, the use of DNA analysis is one click away on the Internet. People can perform DNA tests from their homes, and third parties can obtain the DNA of other individuals without restraint.
> ***
> DNA evidence is no stranger to pop culture. Anyone who watches television is likely aware that DNA can be left at the scene of a crime. Popular networks
> (continued...)

public certain evidence does not, by itself, demonstrate a reasonable expectation of privacy in that evidence. "[W]hile *Katz* says it is no search to discover what one 'knowingly exposes,' it does not declare the exact reverse of this proposition. That is, the [Supreme] Court did not say that discovery of what was not knowingly exposed is inevitably a search." 1 LaFave, *supra*, § 2.2(d), at 649.

Petitioner finds support for his argument in the Supreme Court's decision in *Kyllo v. United States*, *supra*. There, the police suspected that an individual was growing marijuana within his home. 533 U.S. at 29. As part of their investigation, the police, who remained in their vehicle across the street from the suspect's home, used a thermal imager to scan the home. *Id.* at 29-30. The scan revealed that the roof over the garage and a side wall were hot compared to the rest of the home, and substantially warmer than neighboring homes. *Id.* at 30. Based upon this information, the police believed that the suspect was growing marijuana using halide lights. *Id.* Relying in part upon the results of the thermal imager scan, the police applied for and obtained a search warrant for the suspect's home, which, indeed, contained an indoor marijuana growing operation. *Id.* The *Kyllo* Court held that, "[w]here, as here, the Government uses a device that is not in general public use, to explore details of

---

[12](...continued)
broadcast shows such as CSI, Law and Order, and Forensic Files, all of which feature DNA evidence in the laboratory and courtroom on a regular basis, have a combined audience of over fifty-million viewers.

Laura A. Matejik, *DNA Sampling: Privacy and Police Investigation in a Suspect Society*, 61 Ark. L. Rev. 53, 78-80 (2008).

the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40.

Petitioner contends that, like the use of thermal imager scanners on homes, the use of biotechnology by police to create DNA profiles reveals characteristics of the person that are not otherwise visible to the naked eye. *Kyllo*, however, does not stand for the broad proposition that "using 'sense-enhancing technology' to acquire information about an individual is, *ipso facto*, a search." *See* D.H. Kaye, *Who Needs Special Needs? On the Constitutionality of Collecting DNA and Other Biometric Data from Arrestees*, 34:2 J.L. Med. & Ethics 188, 190 (2006). Rather, the central teaching of *Kyllo* is that "any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much," because "*all* details [in the home] are intimate details." 533 U.S. at 37 (quotations and citation omitted). The *Kyllo* Court determined that the thermal imager was, in effect, a substitute for a physical trespass into the home, and thus constituted a search for purposes of the Fourth Amendment. *See id.* at 34.

Not so, here. Even if we were to accept that the DNA profiling technology used in the present case is not "in general public use,"[13] it remains that the police did not use that technology as a substitute for a "trespass" on or into Petitioner's body. *See id.* The police

---

[13] At least one commentator has noted that "the claim that DNA profiling is not in public use is, at worst, false, or at best, in need of refinement or development." D.H. Kaye, *Who Needs Special Needs? On the Constitutionality of Collecting DNA and Other Biometric Data from Arrestees*, 34:2 J.L. Med. & Ethics 188, 191 (2006).

did not seize genetic material from Petitioner, nor in any way search him for it, but rather, collected it from an object on which the material had been left.

In the end, we hold that DNA testing of the 13 identifying junk loci within genetic material, not obtained by means of a physical intrusion into the person's body, is no more a search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public—visage, apparent age, body type, skin color. That Petitioner's DNA could have disclosed more intimate information is of no moment in the present case because there is no allegation that the police tested his DNA sample for that purpose. Because the testing of Petitioner's DNA did not constitute a search for the purposes of the Fourth Amendment, he was not entitled to suppression of the DNA evidence or any fruits derived therefrom. The Court of Special Appeals came to the same conclusion. We therefore affirm the judgment of that Court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Harford County
Case No. 12-K-08-001527
Argued: April 8, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 69

September Term, 2012

GLENN JOSEPH RAYNOR

v.

STATE OF MARYLAND

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
McAuliffe, John F. (Retired,
Specially Assigned),

JJ.

Dissenting Opinion by Adkins, J., which Harrell
and Greene, JJ. join.

Filed: August 27, 2014

Most respectfully, I dissent. The Majority holding represents a significant extension of the State's right to invade private rights of individuals in their DNA beyond that authorized by the Supreme Court's decision in *Maryland v. King*, 569 U.S. ___, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (2013). The result of the Majority opinion is that, short of searching a person via touch or entering her home, the State may collect any person's DNA, create a genetic profile, and add it to the CODIS database,[1] all without implicating, let alone respecting, any constitutional protection. The State may do this regardless of the legal status of the person. In my view, this holding is unfounded, and a warrantless search of a free citizen's[2] DNA against his will should be considered unreasonable and a violation of the Fourth Amendment.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. An unbiased magistrate may grant a warrant

---

[1] According to Md. Code (2003, 2011 Repl. Vol., 2013 Supp.), § 2-501(c) of the Public Safety Article ("PS"):

> (1) "CODIS" means the Federal Bureau of Investigation's "Combined DNA Index System" that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories.
>
> (2) "CODIS" includes the national DNA index administered and operated by the Federal Bureau of Investigation.

[2] By "free citizen" I mean a person who has not been arrested or detained on the basis of probable cause or reasonable suspicion. I include in this category persons who are not United States citizens, but who reside here legally.

to search and seize based upon probable cause. *See id.* If there were probable cause for Raynor's arrest, the police could have obtained Raynor's DNA by following normal booking procedures.[3] The State could also have obtained his DNA if he were already a parolee, a probationer, or incarcerated.[4]

A warrantless search, however, must be submitted to the test of reasonableness by balancing legitimate government interests with a person's privacy expectation. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118–19, 122 S. Ct. 587, 591, 151 L. Ed. 2d 497, 505 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S. Ct. 1297, 1300, 143 L. Ed. 2d 408, 414 (1999)). The controlling modern test to establish whether a person has a privacy interest entitled to protection under the Fourth Amendment was penned by Justice Harlan in his concurrence in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Justice Harlan set forth a two-part test: (1) that the person exhibits an actual, subjective

---

[3] The victim had identified for the police anyone with whom she had contact who might be a suspect. Approximately 23 persons consented to having their DNA swabbed, but Raynor did not. As the Majority did not rest its opinion on the existence of probable cause for Raynor's arrest, and the State concedes Raynor was not under arrest, I do not address the question of probable cause.

[4] *See Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) (parolee); *Corbin v. State*, 428 Md. 488, 52 A.3d 946 (2012) (probationer); *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004) (incarcerated person).

2

expectation of privacy; and (2) that society is prepared to recognize the privacy interest as "reasonable." *Id.* at 361, 88 S. Ct. at 516, 19 L. Ed. 2d at 587–88.

As I see it, two distinct events happened in this case that raise Fourth Amendment concerns. The first is the State's collection of Raynor's DNA from the police station chair after inviting him to the station for questioning, at which time he refused to submit to DNA testing. The second is the analysis and submission to the CODIS database of the DNA. Here, the Majority neatly disregards the first step, relying on counsel's words at oral argument as a deemed "concession" from Raynor that the police acquired his DNA legally. In doing so, the Majority lifts these events from their real-life context, and places them in a more palatable milieu—comparing them to fingerprints the police happen to find in some public place. This short-cut by the Majority avoids addressing the crucial issue of whether police can legally "invite" free citizens into the station for questioning, with the intended purpose of surreptitiously collecting their DNA for analysis and submission to CODIS, and effectuate that collection against their express refusal.

### King And The DNA Collection Act

As *Knights* instructs us, we must weigh the government's interest against that of the individual. To support its claim to a strong governmental interest in Raynor's DNA, the State proffers a body of case law, and state interests identified therein, which applies **only in the context of an arrest**. Most, if not all, of these cases were decided under the DNA Collection Act. Md. Code (2003, 2011 Repl. Vol., 2013 Supp.), § 2–501 *et seq*. of the

Public Safety Article ("PS").[5] This Act, which the police relied upon in *King*, mandates collection of DNA from all persons arrested for certain crimes and contains clear restrictions on use of that DNA. PS §§ 2–504(a)(3); 2–505(b)(2). Not only does it restrict such collection to those arrested, but it also requires that the DNA be removed from the database if the person is not convicted.[6] The Act also restricts use of the DNA strictly to "records that directly relate to the identification of individuals[.]" PS § 2–505(b)(1). Significantly, there is no statute authorizing such police action against persons who are not under arrest.

Unlike Mr. King, undisputedly, Raynor was not arrested and therefore was not subject to the DNA Collection Act. Thus, in examining Raynor's rights, we deal with a different paradigm, involving rules markedly distinct from those applicable in *Maryland v. King, Williamson v. State,* 413 Md. 521, 993 A.2d 626 (2010), and similar cases. As explained below, arrestees are a class of persons with a diminished expectation of privacy. The DNA Collection Act depends on this diminished expectation of privacy in mandating collection of an arrestee's DNA.

Unlike its lesser interest in free citizens, who possess the full panoply of constitutional rights, the State has considerably weighty interests in learning the true identity of an arrestee. The *King* Court enumerated five state interests advanced by the DNA Collection Act: first, the need to identify "who is being tried"; second, the need to

---

[5] Discussed *infra*.

[6] *See* PS § 2–511 (requiring removal of a person's DNA profile if she is not convicted).

4

ensure the detainee does not create "inordinate 'risks for facility staff'"; third, the need to

ensure persons are available for trial; fourth, the need to determine the threat posed to

society (by finding if the arrestee committed other crimes); and fifth, the possibility of

freeing an innocent man wrongfully imprisoned in his stead. *King*, 569 U.S. at ___, 133

S. Ct. at 1971–74, 186 L. Ed. 2d at 22–24 (citations omitted). Not one of those interests

applies to Raynor.

By endorsing the police action in this case against a free citizen, the Majority

opinion considerably extends the *King* holding beyond the boundary of what should be

considered constitutional.[7] The limited scope of the Supreme Court's holding in *King* is

revealed in the High Court's concluding paragraph:

---

[7] As Justice Scalia declared, "[s]olving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches. The Fourth Amendment must prevail." *Maryland v. King*, 569 U.S. ___, 133 S. Ct. 1958, 1989, 186 L. Ed. 2d 1, 41 (2013) (Scalia, J., dissenting); *see also Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 619, 109 S. Ct. 1402, 1414, 103 L. Ed. 2d 639, 672 (1989) (Marshall, J., dissenting) (reasoning that searches as part of the "normal need for law enforcement" are not included in the narrow category of warrantless searches). In *Raines* we upheld as legitimate a buccal swab of an inmate under the DNA Collection Act, and expressly distinguished two cases that failed the reasonableness test on grounds that the only government interest was general evidence-gathering:

> Additionally, both [*City of Indianapolis v.*] *Edmond* [, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)] and *Ferguson* [*v. City of Charleston*, 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001)] are distinguishable on their facts from the DNA collection context for two reasons. First, the *Edmond* and *Ferguson* cases involved searches of ordinary citizens without individualized suspicion, not incarcerated criminals. Second, the primary purpose of the government actions in those cases

5

> In light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody. Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

569 U.S. at ___, 133 S. Ct. at 1980, 186 L. Ed. 2d at 32. The High Court expressed no intent to authorize police, in their unfettered discretion, to invite free citizens to police stations, collect their DNA when they leave, test the DNA to create a profile, and submit the visitor's profile to the CODIS Database, all against the free citizen's wishes.

As I see it, here, the police conducted one search by collecting Raynor's DNA from the chair, and a second search when they tested it to create a profile. *See, e.g.*, *United States v. Amerson*, 483 F.3d 73, 85 (2d Cir. 2007) ("There is, however, a second and potentially much more serious invasion of privacy occasioned by the DNA Act. As we recognized in *Nicholas*, the 'analysis and maintenance of [offenders'] information' in CODIS, the federal database is, in itself, a significant intrusion. We are mindful of the vast

---

was not to identify individuals, but to gather evidence of crimes, thus acting like a general warrant.

383 Md. at 21–22, 857 A.2d. at 31.

amount of sensitive information that can be mined from a person's DNA and the very strong privacy interests that all individuals have in this information." (quoting *Nicholas v. Goord*, 430 F.3d 652, 670 (2d Cir. 2005))); s*ee also Mario W. v. Kaipio*, 230 Ariz. 122, 128, 281 P.3d 476, 482 (Ariz. 2012) ("This second search presents a greater privacy concern than the buccal swab because it involves the extraction (and subsequent publication to law enforcement nationwide) of thirteen genetic markers from the arrestee's DNA sample that create a DNA profile effectively unique to that individual."). Alternatively, these two searches may be seen as two parts of a single search.

Without an authorizing statute with defined limitations on use of the DNA, under the Majority opinion, the police have unfettered choice as to who to bring into the station for non-permissive DNA collection and testing, thus allowing for arbitrary decisions. Without the restrictions of the DNA Collection Act, the State also has the ability to retain a private citizen's DNA, to be mined in future years, for whatever purposes it desires. *See Amerson*, 483 F.3d at 85; *United States v. Kincade*, 379 F.3d 813, 843 (9th Cir. 2004) (Reinhardt, J., dissenting) ("[A]ll Americans will be at risk, sooner rather than later, of having our DNA samples permanently placed on file in federal cyberspace, and perhaps even worse, of being subjected to various other governmental programs providing for suspicionless searches conducted for law enforcement purposes.").

The Supreme Court in *King* emphasized that the DNA Collection Act mandated that DNA be collected from all persons arrested for certain crimes, and the Court considered it material that the officers had no discretion to decide whose DNA would be taken. *See King*, 569 U.S. at ___, 133 S. Ct. at 1969–70, 186 L. Ed. 2d at 20–21. In all of the DNA

7

collection cases discussed by the parties, the government's right to collect the DNA hinged on the individual being part of a diminished status group, such as an arrestee. *See, e.g.*, *King*, 569 U.S. ___, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (arrestee); *United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011) (arrestee); *Williamson*, 413 Md. 521, 993 A.2d 626 (2010) (arrestee); *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004) (incarcerated person). As I indicated, in each of these cases, the primary government interest was only established once the person became a detainee or arrestee. Here, that critical linchpin is glaringly absent.

### *Nature Of Privacy Interest In DNA And Supreme Court Protection Of Privacy*

The privacy interest Raynor sought to protect, his DNA, is immensely personal and private, and deserves the staunchest protection under the Fourth Amendment. DNA has the potential to reveal enormous amounts of private information about a person. With today's technology, scientists have the power to discern genetic traits, behavioral tendencies, propensity to suffer disease or defects, other private medical information, and possibly more. *Williamson*, 413 Md. at 564, 993 A.2d at 652.[8] *Cf. Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 1413, 103 L. Ed. 2d 639, 659 (1989) ("It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic,

---

[8] DNA contains "an individual's entire genome, [and thus,] tissue samples retained by the government threaten privacy interests the most, yet they receive less attention than the computer profiles contained within DNA databases." Elizabeth E. Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy*, 100 Nw. U. L. Rev. 857, 871 (2006).

8

pregnant, or diabetic."). Raynor explicitly refused police acquisition of his DNA, and such assertion of his privacy right deserved protection. His presence at the station and his objection also distinguish the police action here from police finding DNA of some unidentified person, which has some connection to a crime being investigated. The Majority, though, in refusing to treat the collection of Raynor's DNA from the chair as a search for Fourth Amendment purposes based on counsel's "concession," turns a blind eye to this important consideration.

The Supreme Court has repeatedly recognized the existence of privacy protection outside of the Fourth Amendment context, particularly bodily privacy and the right of a person to control information about himself and intimate aspects of life. *See Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (striking down law against sodomy between consenting adults on privacy grounds); *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) (constitutional right of privacy encompasses decision involving termination of pregnancy); *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (constitutional right of privacy in use of contraceptives). If a warrant is required for the police to see the personal intimate details kept secured in one's home,[9] then logically a warrant is required to seize the same private information locked inside of an individual. *See* Stephanie B. Noronha, Comment, *Maryland v. King: Sacrificing the Fourth Amendment to Build Up the DNA Database*, 73 Md. L. Rev. 667,

---

[9] *See Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (using thermal imaging device to gather information about heat in home's interior constitutes search).

685 (2014) (arguing that the reasoning in *King* "begs the question: why is it that the Court finds privacy, secrecy, and autonomy within the four walls of the home paramount, but does not hold intrusion into the human body to as high of a standard?" (Footnote omitted)).

### *Recent Federal Cases On Privacy Rights Even Without Physical Invasion*

The ongoing debate regarding cloud technology and collecting intangible data depicts the tremendous intrusions that can occur without a physical invasion. In its decision in *United States v. Davis*, 690 F.3d 226, 231 (4th Cir. 2012), the Fourth Circuit warned of police trampling on an individual's Fourth Amendment rights when the police collected a DNA sample from the defendant's pants and created a profile without probable cause, resulting in an unreasonable search. The court reasoned that the absence of a judicial officer to approve or deny the use of an individual's DNA accords police an unchecked power that can be exercised arbitrarily. *See id.* at 249–50.

Less than three months ago, in a case involving a different Mr. Davis, the Eleventh Circuit held that the government's collection of electronic location information from the defendant's cell phone service provider, without probable cause, resulted in a violation of the defendant's Fourth Amendment protections. *See United States v. Davis,* 754 F.3d 1205, 1216–17 (11th Cir. 2014). The Eleventh Circuit rejected the government's abandonment and lack of physical intrusiveness justifications, agreeing with the proposition that when a cell phone user receives a call, he does not voluntarily expose anything, even though the location of his cell phone is automatically traced. *Id.* at 1217. The dual *Davis* cases support the notion that an individual's informational privacy should be protected by the Fourth Amendment, even without physical intrusion.

More importantly, the Supreme Court, on June 25, 2014, issued its unanimous decision in *Riley v. California*, holding that, even after a lawful arrest, the police could not seize data from a cell phone in the arrestee's possession without a warrant because of the wealth of personal and private information stored there, including calls made and received. ___ U.S. ___, 134 S. Ct. 2473, ___ L. Ed. 2d ___ (2014). As Chief Justice Roberts wrote for the Court: "[a]n Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns— perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." ___ U.S. at ___, 134 S. Ct. at 2490, ___ L. Ed. 2d at ___. Thus, the Supreme Court has taken another important step in recognition of privacy in personal information *not* tied to a physical intrusion.

### *Flaws In Majority's Reasoning*

The Majority opinion discounts the large amounts of highly personal details that DNA reveals on grounds that here, the State only used the DNA profile for identification. As I indicated earlier, the Majority also sidesteps Raynor's claim for protection of his privacy interests by seizing upon a "concession" that defense counsel made during oral argument. The Majority's logic goes like this: (i) defense counsel at oral argument said it was "okay" for police to take the DNA off the chair in the police station, objecting only to the scientific testing; (ii) the police therefore legitimately took possession of the DNA without a search; and (iii) the only testing the police performed was of the junk DNA for purposes of identification. Maj. Slip Op. at 9–10, 13–14.

11

This reasoning is flawed in several respects. First, we should not decide important constitutional issues based on a statement made by counsel at oral argument. Unlike matters of fact, we are not bound by counsels' stipulations regarding legal principles. As the Kentucky Supreme Court said, "[s]tipulations of the parties will not be allowed to determine the decision of the court on matters involving constitutional or statutory construction or other matters of public interest." *Com. ex rel. Breckinridge v. Nunn*, 452 S.W.2d 381, 382 (Ky. 1970). Second, the police did not test Raynor's DNA for identification because they already knew full well who he was. And, because they were not arresting Raynor, none of the State's interests in safety and other concerns attendant to the identity of incarcerated persons arose. Third, DNA collection and testing is still in its infancy stage, and technology is constantly improving. Thus, it is not unreasonable to believe that the government's capacity for obtaining useful information from "junk" DNA will expand significantly, and will involve the discovery of enlarged personal details in the future.[10] As there is no statute placing limits on either the length of time the DNA may be

---

[10] Federal courts have recognized potential misuse as foreseeable long before Justice Scalia's warning in *Maryland v. King* last year:

> Although the DNA collection as currently implemented involves only junk DNA that is not associated with any known physical or mental characteristics, "new discoveries are being made by the day that challenge the core assumption underlying junk DNA's name—regions of DNA previously thought to be 'junk DNA' may be genic after all." [*United States v.*] *Kincade*, 379 F.3d [813,] 850 [(9th Cir. 2004)] (Reinhardt, J., dissenting). Therefore, we agree that, "[s]hould the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests,

12

retained or the uses to which it may be put, the State is free to test the DNA using scientific techniques we can only imagine today.

The Majority's limited-use-of-information rationale is also inconsistent with the Supreme Court's rulings in *Kyllo v. United States*[11] and *Skinner v. Railway Labor Executives' Association*.[12]  In those cases, the mere *potential* for intrusion on information created an expectation of privacy.  *Kyllo v. United States*, 533 U.S. 27, 38, 121 S. Ct. 2038, 2045, 150 L. Ed. 2d 94, 104 (2001) ("Limiting the prohibition of thermal imaging to 'intimate details' would not only be wrong in principle; it would be impractical in application, failing to provide 'a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment[.]'" (citation omitted));  *Skinner*, 489 U.S. at 617, 109 S. Ct. at 1413, 103 L. Ed. 2d. at 659 ("It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private

---

> a reconsideration of the reasonableness balance struck would be necessary." [*United States v.*] *Amerson*, 483 F.3d [73,] 85 n.13 [(2d Cir. 2007)].

*United States v. Weikert*, 504 F.3d 1, 13 (1st Cir. 2007); s*ee also United States v. Davis*, 657 F. Supp. 2d 630, 662 (D. Md. 2009) ("[T]here are significant privacy interests implicated by the maintenance of one's DNA profile in a government database, above and beyond those implicated by the testing and comparison of one's DNA profile to evidence from a single, specific crime.  Were law enforcement permitted to include individuals' DNA profiles in searchable databases under these circumstances, it would open 'a backdoor to population-wide data banking.'" (citation omitted)).

[11] *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001).

[12] *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 1413, 103 L. Ed. 2d 639, 660 (1989) (finding it "clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable").

medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic."). *See also* Albert E. Scherr, *Genetic Privacy & the Fourth Amendment: Unregulated Surreptitious DNA Harvesting*, 47 Ga. L. Rev. 445, 471 (2013).

The lack of physical intrusion should not resolve the question of whether there was a search. The Supreme Court has repeatedly held that an intrusion and a violation of the Fourth Amendment can occur without crossing physical boundaries. *See Kyllo,* 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (thermal imaging); *Katz,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (wiretap). Justice Harlan's test moves away from strict property-rights interests, and *Katz* rejected the need for trespass, holding that a Fourth Amendment violation can occur by violating a person's privacy without physical intrusion. *See Katz,* 389 U.S. at 353, 88 S. Ct. at 512, 19 L. Ed. 2d at 583. In light of today's cutting-edge technology, under the circumstances here, gathering Raynor's DNA, testing to create a profile, and submitting it to the CODIS database should not be considered as any less intrusive a search and seizure than that which results from a cheek swab. The practical result is the same and it should be seen for what it is: a significant search into the body and permanent seizure of a person's private information.[13]

---

[13] *See Skinner,* 489 U.S. at 650, 109 S. Ct. at 1431, 103 L. Ed. 2d at 681 (Marshall, J., dissenting) ("Only by erroneously deriding as 'minimal' the privacy and dignity interests at stake, and by uncritically inflating the likely efficacy of the FRA's testing program, does the majority strike a different balance."); *Davis v. Mississippi,* 394 U.S. 721, 728, 89 S. Ct. 1394, 1398, 22 L. Ed. 2d 676, 681 (1969) (noting that fingerprinting 24 youth[s] and releasing them without charge as a tool to find a rapist was minimally intrusive, but violated their Fourth Amendment protections because it was "not authorized by a judicial officer").

The Majority's approval of such police procedure means, in essence, that a person desiring to keep her DNA profile private, must conduct her public affairs in a hermetically-sealed hazmat suit.[14] Moreover, the Majority opinion will likely have the consequence that many people will be reluctant to go to the police station to voluntarily provide information about crimes for fear that they, too, will be added to the CODIS database.

The State argues that any DNA shed in any public area is unprotected, an averment that goes too far. The Fourth Amendment protects what a person "seeks to preserve as private, even in an area accessible to the public." *Katz*, 389 U.S. at 351, 88 S. Ct. at 511, 19 L. Ed. 2d at 582. In *United States v. Davis*, the Eleventh Circuit declared that the defendant had "not voluntarily disclosed his cell site location information to the provider in such a fashion as to lose his reasonable expectation of privacy." 754 F.3d at 1217. I strongly submit that a person's DNA deserves at least as much protection as one's whereabouts based on cell phone data. The State concedes that Raynor did not volitionally leave his DNA on the arms of the chair in the police station. Therefore, he still retains an expectation of privacy in his intimate and personal genetic make-up.[15]

### *A New Approach For DNA*

[14] The Majority's holding means that a person can no longer vote, participate in a jury, or obtain a driver's license, without opening up his genetic material for state collection and codification. Unlike DNA left in the park or a restaurant, these are all instances where the person has identified himself to the government authority. All these are troubling consequences of the decision the Court makes today.

[15] Of course the individual's privacy rights in his DNA must yield to the State's interests in that the State may investigate and collect and analyze DNA found at or near the scene of a crime, or on or near a weapon, or other means used to commit a crime. This does not mean, however, that outside that context, the police may gather new DNA from free citizens in an attempt to find a DNA match.

Raynor's counsel argues that the Fourth Amendment requires a new approach that takes into account the advanced technology that allows collection and harvesting without invasion, and recent knowledge that we shed DNA everywhere we go throughout each day. I agree and propose that we treat the zone of privacy **not** in terms of Raynor's physical DNA in the form of saliva or sweat, but his expectation of privacy from exposure of the results of scientific tests performed on his DNA.

**Conclusion**

The State concedes that Raynor was not an actual suspect at the time his DNA was taken and tested, because the one piece of information that caused police to ask him to come to the station was the rape victim's claim, two years after the crime, that she had a hunch he may have been involved. This occurred after she had previously identified 22 other persons, whom the police interviewed as "persons of interest." Moreover, Raynor refused to give a DNA sample, and specifically said that he did not wish to be in the CODIS database. Under these circumstances, the balance of the *Katz* reasonableness test shifts dramatically. Here, the State lacks the weighty government interests that were present in *King* and earlier cases. Such interests arise when the police possess probable cause to make an arrest and take a person into custody, thus diminishing the person's expectation of privacy.

On the other hand, Raynor's expectation of privacy in his DNA deserves the utmost protection because he was a free citizen at the time of police questioning. The defining traits of DNA illustrate dignitary, informational, and personal characteristics that the

16

Supreme Court has come to protect in other contexts, even without physical intrusion. There *was* a search here, and it was an unreasonable one that violated Raynor's Fourth Amendment Constitutional rights. I would reverse the judgment of the Court of Special Appeals, and remand the case to that court with direction to reverse the judgment of the Circuit Court of Harford County and direct the court to grant Raynor's motion to suppress.

Judges Harrell and Greene authorize me to state that they join the views expressed in this dissent.